ROBERT P. LARSON, FATHER AND NATURAL
GUARDIAN OF BRADLEY LARSON, A MINOR, AND
ANOTHER v. THE BELZER CLINIC AND OTHERS.

195 N. W. 2d 416.

February 18, 1972—No. 42762.

*Lindquist & Vennum, William C. Mortensen,* and *Kurtis A. Greenley,* for appellants.

*Meagher, Geer, Markham & Anderson, B. B. Markham, Mary Jeanne Coyne,* and *O. C. Adamson II,* for respondents.

Heard before Knutson, C. J., and Otis, Rogosheske, and Peterson, JJ.

OTIS, JUSTICE.

This is an action for malpractice, arising out of an injury to a 4-year-old child, against an attending physician, his partnership, and the hospital where the patient was confined. The jury returned verdicts in favor of defendants. On appeal, the issues are, first, whether it was error to deny plaintiffs the right to elicit an expert opinion from defendant doctor; second, whether defendants' closing argument was unfairly prejudicial to plaintiffs; and third, whether the doctrine of res ipsa loquitur should have been applied. We resolve the first two issues in plaintiffs' favor and reverse.

Bradley Larson, who was born on June 15, 1959, sustained a fracture of the left femur on April 5, 1963. He was taken to Fairview Hospital and treated by Dr. F. S. Stiegler of The Belzer Clinic. The doctor conferred with Bradley's parents on the question of whether the boy should be treated in a cast or by a so-called "Bryant's traction." After consulting the doctor, the family elected to use the traction since Mrs. Larson was a polio victim and would find it difficult to carry the child if he wore a cast.

In order to suspend the child's leg by the use of weights and pulleys to align the broken bones, it was necessary to wrap his legs with nonadhesive elastic bandages. It is undisputed that with the use of this device it is necessary to make frequent inspections of the bandages to prevent them from slipping since there is always the potential danger that the bandages may cut off circulation in the leg and foot. To prevent such complications, Dr. Stiegler insisted that he be kept informed of the need for rewrapping the bandages and indicated that daily inspection by him, and oftener by the hospital, was in order.

On April 17, the doctor noted "superficial ischemic changes" in the left heel, indicating a block in the circulation which cut off the blood supply. By the time Bradley left the hospital on May 12, he had developed a skin necrosis. In April 1970, Bradley was examined by a plastic surgeon who found on the top of Bradley's left foot an area of scar tissue two inches long and one and a quarter inch wide. On the back of the heel, there was a 2-inch square area of scar tissue which adhered to the heel bone. The doctor testified that the scar tissue might prevent the normal function of the heel and that it would have to be periodically examined to determine whether ulcerations or sores were developing. He recommended a skin draft to provide a better covering for Bradley's heel.

■ Prior to the trial which began May 11, 1970, plaintiffs urged the court to continue the matter until we reached a decision which was pending on the right to cross-examine a defendant doctor for the purpose of eliciting an expert opinion. That decision, favorable to plaintiffs' contention, was released on October 23, 1970, Anderson v. Florence, 288 Minn. 351, 181 N. W. 2d 873. In addition, plaintiffs called to the trial court's attention a memorandum of Judge Nicholson allowing such cross-examination, which was the subject of review in the Anderson case. The trial court declined to continue the case or to follow the rule applied by Judge Nicholson, which we later sustained, and adhered to our holding in Ericksen v. Wilson, 266 Minn. 401, 123 N. W. 2d 687 (1963), and Hoffman v. Naslund, 274 Minn. 521, 144 N. W. 2d 580 (1966), overruled by us in the Anderson decision.

In this posture, we hold that plaintiffs fully protected their record. In reversing we need not deal with the question of whether Anderson should be applied retroactively. Had there been no Anderson case, we would now adopt the principles which plaintiffs advocated before the trial court. We think it equally important that the chance selection of a trial judge should not deter-

mine the outcome of an appeal. Had Judge Nicholson been assigned this matter, plaintiffs would have prevailed on the question of whether they had a right to elicit expert opinions from defendant doctor.

The court sustained objection to all of the following questions directed at Dr. Stiegler:

"Doctor, could you tell us what the custom and practice is in this general locality as far as the care of a patient in Bryant's traction, insofar as it involves avoiding complications and circulatory problems?"

"And what happens if the blood vessels are cut off from the skin?"

"* * * Well, can this Ace bandage on Ace bandage on the skin, can this cause pressure?"

"And if that happens [the wrappings causing pressure on the foot and heel], the circulation in part or all of the foot can be cut off?"

"Well, I guess my question was directed to true ischemic changes. A loss of circulation can cause necrosis, can it not?"

"Doctor, in the care of a child in Bryant's traction in this community, this general locality, the standard of care for physicians and surgeons in good standing is to check the traction, to check the wrappings, and to check the foot for circulation daily just as you say you did, is it not?"

Although the Anderson case dealt with pretrial discovery, we made it clear the rule we there adopted would also apply at trial (288 Minn. 361, 181 N. W. 2d 879):

"* * * As the New York court recognized, the usual and customary medical procedures and whether defendant deviated therefrom are certainly 'pertinent and relevant' to a malpractice action. It should be emphasized that a defendant physician's general expertise is not on trial or in issue; the question to be resolved is whether his conduct and medical judgment in a par-

ticular case amounted to a professional mistake. Seen in this light, it is not unfair to allow the opposing party to elicit the malpractice defendant's expert opinion."

In Anderson we stressed the professional duty of a physician to provide his patient with all the information necessary for the patient to understand what has occurred in the treatment rendered, to the end that "a patient's just claim will not fail for want of available expert medical testimony." We reiterate those views in the case before us. Dr. Stiegler not only failed to advise his patient's parents of the disability which had developed in the course of his treatment, leaving that unpleasant responsibility to the hospital, but invoked the right at trial to withhold basic information with respect to whether he followed the usual medical practice in his course of treatment. No principle occurs to us in reason or in logic why doctors should not be obliged to account for their course of treatment where a patient has suffered some disability arising out of that treatment. In every other profession or business, where the results of an undertaking are unfavorable, the responsible persons are required to give their opinions regarding the course of action taken, and that which is ordinarily pursued under similar circumstances. It is not asking too much of the medical profession to explain, if they can, their failures, as well as their successes, and in the process to give their expert opinions. Accordingly, we hold that it was error for the court to exclude the evidence which plaintiffs sought to elicit from defendant doctor.

■ Appellate courts are reluctant to disturb verdicts on the ground of improper oral argument and must necessarily leave to the trial court the responsibility for determining the line between legitimate advocacy and unfair overreaching. Here, however, we feel obliged to express our disapproval of defendants' trial tactics.

The cause of the accident which resulted in Bradley's injury was wholly immaterial to the issues in the case. Nevertheless,

counsel in cross-examination of Bradley's father dwelt on the fact that Bradley had "escaped" from a fenced yard and had pulled down on himself a neighbor's window box. This testimony was exploited in counsel's closing argument as follows:

"* * * Now all of you would agree with me, I am sure, that had not young Bradley at three and a half years old escaped from the fence in the back yard, went several houses down the block and got into his neighbor's yard and fence, and in some fashion pulled this window box down upon him and fractured his leg, Doctor Stiegler wouldn't be here and nothing would ever have happened."

Clearly, this was an ill-concealed attempt on the part of counsel to shift the blame for Bradley's disability from Dr. Stiegler to Bradley himself. The circumstances of the injury were irrelevant, and the argument was improper.

Elsewhere in his argument, defense counsel addressed himself directly to plaintiffs' attorney, calling him by name on at least a dozen occasions. We disapprove of this practice. In the context in which it was done, it was an unworthy effort to discredit opposing counsel.

At another point in the argument, defendants' counsel stated:

"* * * He had a severely fractured femur. If the bone was broken apparently as you see it in here, obviously the tissues in and around the bone and nerves had to be injured and damaged and cause pain. Unfortunately, Doctor Stiegler can't do much about that except prescribe medications. He didn't break his leg. He's trying to help him."

Soon thereafter, counsel followed with this:

"* * * For the care of this boy to sometime I think the evidence shows in 1964, at least for the care so far as the foot is concerned, the charge was $150. Now, you just divide that by 42 times. Forget about the results and how lucky he is to have a good result. That's something less than $4 a time. Now, that

was his reward and four days in the courtroom because he got a blister on his heel."

Again, the amount the doctor charged was wholly irrelevant to the issue of malpractice. To cast the plaintiffs in the role of ungrateful recipients of the doctor's generosity was unwarranted.

In the same vein, counsel made this observation to the jury:

"* * * But this is pretty important, because these members of our society, the Doctor Stieglers and the rest of them, are members of our society that you and I and all of us and Mr. Mortensen [plaintiffs' attorney] need pretty badly. The advancements of these men in the last few years have been—"

to which plaintiffs' counsel objected and was overruled.

It is unlikely that any of the matters to which we have referred, standing alone, would be grounds for reversal. The sum of them, however, characterizes the argument as prejudicial and unfair. In close cases such as this, it may be enough to tip the scale.

■ Plaintiffs contend that it was error for the trial court to refuse a requested instruction on the doctrine of res ipsa loquitur. The rule as it applies to malpractice cases was exhaustively considered in Miller v. Raaen, 273 Minn. 109, 139 N. W. 2d 877 (1966). We need not elaborate on what we there said except to hold that it was proper for the trial court to deny the request.

Reversed and remanded for a new trial.

KNUTSON, CHIEF JUSTICE (concurring specially).

I concur in the result because I feel bound by the court's decision in Anderson v. Florence, 288 Minn. 351, 181 N. W. 2d 873 (1970). My views on the issue of whether a doctor in a malpractice action may be cross-examined to elicit his expert opinion are expressed in my dissent in that case.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.